# Wytheville.

## SUN COMPANY v. N. CHARTER BURRUSS, ET AL.

### June 12, 1924.

1. ATTACHMENT AND GARNISHMENT—*Failure of Plaintiff to Execute Bond Acting as Dismissal—Defendant Filing Affidavit of Substantial Defense—Jurisdiction to Adjudicate the Merits.*—Plaintiff sued out an attachment, averring that defendant was a foreign corporation having property within the State and that it intended to remove and had removed its effects from the State.   Defendant, under Code of 1919, section 6385, filed an affidavit that it had a substantial defense.   The plaintiff failed to give the bond required by section 6385, which provides that the attachment shall stand dismissed unless such bond is given.   It was contended that because of the failure of plaintiff to execute the bond that the entire proceeding stood dismissed. But the lower court held that the affidavit of substantial defense constituted a general appearance and this position was affirmed on appeal.   The lower court therefore had jurisdiction to adjudicate the merits of the case.

2. ATTACHMENT AND GARNISHMENT—*Dismissal of Attachment—Hearing on the Merits.*—Section 6385 of the Code of 1919 provides that on filing an affidavit of substantial defense the attachment shall stand dismissed unless plaintiff gives bond.   The statute only provides that the attachment shall stand dismissed, and this, at least inferentially, suggests that while the attachment may be dismissed the court may still proceed to adjudicate the merits of the controversy just as it might in an action at law in which the court had jurisdiction.   That this is a correct inference is perfectly apparent from several other sections of the chapter on attachments.

3. APPEARANCE—*General Appearance—Attachment—Hearing on Merits.*—Code of 1919, section 6404, provides that in attachment proceedings that if the court would otherwise have jurisdiction of the action, and the defendant has appeared generally, or been served with process, it shall retain the cause and proceed to final judgment in like manner as if it had been a motion matured for hearing.

4. APPEARANCE—*General Appearance—Attachment—Affidavit of Substantial Defense.*—In the instant case, a proceeding by attachment, defendant filed an affidavit that it had a substantial defense to the plaintiff's claim and that it did not owe the plaintiff any sum whatever.

Syllabus.

*Held:* That this affidavit was the equivalent of a plea to the merits and operated as a general appearance.

5. Appearance—*Effect of Appearance—What Constitutes a General Appearance.*—The object of service of process is only to notify persons of the suit and bring them under the power of the court. Appearance answers the same purpose. By it the party submits himself to the jurisdiction of the court. Any appearance, except to object to the jurisdiction—as, for instance, to take advantage of defect in process or return—is a general appearance, not special, and will dispense with its service. Any motion in the case will do so.

6. Sales—*Place of Delivery—Case at Bar.*—A contract of sale provided that all shipments were to be made to the buyer at Marcus Hook, Pa. The collateral facts show that Marcus Hook was not the destination of the subject of the sale, but that the destination or place of delivery was Norfolk.

   *Held:* That as the vendor clearly understood that the subject of sale was to be consigned to the vendee at Norfolk to be marketed there, there was no substantial error in an instruction on the measure of damages for breach of contract by the vendor which treated Norfolk as the place of destination.

7. Sales—*Measure of Damages—Breach of Contract by Vendor—Case at Bar.*—In the instant case an action by the purchaser of oil against the vendor for breach of contract, the trial court instructed the jury that the measure of damages for failure to deliver merchandise is the difference between the contract price and the selling price at the time and place of delivery; and that if the jury should find for the plaintiff they should assess his damages at the difference between the contract price plus the freight, and the price at which they believe from the evidence the oil would have been sold at the time and place of delivery. Defendant contended that instead of using the price at which the oil could have been sold at the place of delivery, the term "market price" should have been used.

   *Held:* That there was no merit in this contention.

8. Sales—*Breach of Contract by Vendor—Measure of Damages—Market Price.*—The market price is the price at which willing sellers are ready to take and which willing buyers are ready to give.

9. Sales—*Cancellation of Contract—Financial Responsibility of the Purchaser—"Satisfactory"—Case at Bar.*—In the instant case an action by the purchaser of oil against the vendor for breach of contract, the contract of sale provided that the financial responsibility of the buyer must at all times be "satisfactory" to the seller or shipments might be suspended. There was a rising market and the vendor persistently violated the contract. The vendor was competing with the vendee and other dealers in oil in the vendee's market and preferred to take advantage of the rising prices to fulfilling his contract.

> *Held:* That under these circumstances the trial court was amply jus
> tified in instructing the jury that the vendor could not escape respon
> sibility for its breach of the contract on the ground of dissatisfaction
> with the financial responsibility of the buyer unless it had acted in
> "good faith."

10. ·SALES—*Breach of Contract by Vendor—Excuses for Failure to Deliver
> Goods.*—It is not creditable to human nature that so frequently when
> prices advance sharply, it is the vendors who make excuses for fail
> ure to deliver the goods sold, while when there is a serious recession
> in prices it is the vendees who seek to avoid their obligations.   The
> legal rule and business morality accord.   They alike commend him
> who, after swearing to his own hurt, changes not; and courts should
> be astute to maintain the sanctity of such contracts—not acute to
> support excuses which are not reasons for avoiding them.

Error to a judgment of the Law and Chancery Court ·of the city of Norfolk, in a proceeding by motion for a judgment for money.   Judgment for plaintiff.   Defendant assigns error.

*Affirmed.*

The opinion states the case.

*Baird, White & Lanning* and *R. Clarence Dozier,* for ·the plaintiff in error.

*Mann & Tyler,* for the defendants in error.

PRENTIS, J., delivered the opinion of the court.

[1-4] Sun Company (a corporation), defendant in the ·trial court, complains of an adverse judgment for dam.ages claimed by N. Charter Burruss, arising out of an alleged breach of contract for the sale of 500 barrels of ·oil, and for $160.00 accrued rent.   The vendee, Burruss, sued out an attachment, averring that the vendor ·was a foreign corporation having estate in the city of .Norfolk, and that it intended to remove and had re-

moved its effects out of the State, so that there would probably not be therein effects sufficient to satisfy his claim when judgment therefor should be obtained should only the ordinary process of law be invoked. The vendor, defendant, under Code section 6385, filed an affidavit that it had a substantial defense to the merits of the plaintiff's claim. That section provides that when this is done the attachment shall stand dismissed *ipso facto*, unless within ten days from the notification thereof by the clerk, the plaintiff, or some one for him, shall enter into a bond with condition to prosecute his attachment diligently, etc.

The vendee did not execute such a bond, and the first error assigned is that by force of this statute the entire proceeding stood dismissed, and that the trial court had no further jurisdiction of the case.

This motion was overruled upon the ground that the affidavit here filed constituted a general appearance.

In considering the question thus raised, we refer first to this affidavit. It shows that the vendor, by its agent, made oath "that the said principal defendant has a substantial defense to the merits of the plaintiff's claim; that the said plaintiff has no claim against the said principal defendant, and that the said principal defendant does not owe the said plaintiff any sum whatever." It is observed that the affidavit, in addition to claiming that the vendor had a substantial defense, proceeds further and may be fairly construed to be a plea in bar to the petition, for it avers that the defendant does not owe the plaintiff. In addition to this, the vendor defendant here was not content to rest upon the affidavit, but before the ten days elapsed executed a bond under Code section 6394, for the purpose of releasing the property from the lien of the attachment, with con-

dition to have it forthcoming at such time and place as the court might require.

The contention is that the filing of the affidavit of substantial defense, followed by the failure of the plaintiff to execute bond within ten days, *ipso facto* operates to terminate the proceeding and to defeat the jurisdiction of the court. The statute relied on, however, only provides that the attachment shall stand dismissed, and this, at least inferentially, suggests that while the attachment may be dismissed the court may still proceed to adjudicate the merits of the controversy just as it might in an action at law in which the court had jurisdiction. That this is a correct inference is perfectly apparent from several other sections of the chapter on attachments. Code section 6404, expressly provides that if the court would otherwise have jurisdiction of the action, and the defendant has appeared generally, or been served with process, it shall retain the cause and proceed to final judgment in like manner as if it had been a motion matured for hearing. Burks' Pl. & Pr. (2d ed.), page 698, section 359, *Id.*, page 711, section 360, *et seq.* So it is manifest that if the defendant appeared generally and pleaded to the petition for attachment, the court had jurisdiction of the controversy. There may be cases in which it is difficult to determine whether there has been a general appearance, but in this case there seems to be little reason for questioning the correctness of this ruling.

[5] If authority is necessary, it is sufficient to refer to *Frank* v. *Zeigler*, 46 W. Va. 618, 33 S. E. 762, where it is said: "The object of the service of process is only to notify persons of the suit, and bring them under the power of the court. Appearance answers the same purpose. By it the party submits himself to the jurisdic-

tion of the court. Any appearance, except to object to the jurisdiction—as for instance, to take advantage of defect in process or return—is a general appearance, not special, and will dispense with its service. Any motion in the case will do so." And in *Norfolk & Ocean View Ry. Co.* v. *Turnpike Co.*, 111 Va. 131, 66 S. E. 346, Ann. Cas. 1912-A, 239, the rule is thus stated: "An appearance for any other purpose than questioning the jurisdiction of the court because there was no service of process, or the process was defective, or the action was commenced in the wrong county, or the like, is general and not special, although accompanied by the claim that the appearance is only special. A motion to vacate proceedings in a cause, or to dismiss or discontinue it because the plaintiff's pleading does not state a cause of action, is equivalent or analogous to a demurrer, and amounts to a general appearance." *Rosenberg* v. *U. S. Fidelity & Guar. Co.*, 115 Va. 221, 78 S. E. 557; *McGeorge* v. *Harrison, etc., Co.* 141 Pa. St. 575, 21 Atl. 671.

Our conclusion is that the affidavit of substantial defense in this case was the equivalent of a plea to the merits, and this without reference to its effect upon the attachment. Inasmuch, however, as before the attachment abated the plaintiff subsequently gave the bond referred to, it may be that the court still has jurisdiction over the property attached.

The jury having found a verdict for the plaintiff, there was a motion to set it aside as contrary to the law and the evidence, and for error in granting and refusing instructions. This makes it necessary to consider the pertinent facts.

[6] The contract was dated January 16, 1920. There had been a previous agreement between the parties for the sale of the same commodity—oil of the vendor's

grade and brand "No. XCIX." Differences had arisen as to the performance of the previous contract, but notwithstanding these pending differences, and a balance then due by the vendee, the contract sued on was entered into. It required shipments of oil by the vendor in approximately equal monthly quantities from January 16th to July 15, 1920, the buyer to furnish specifications promptly and uniformly, and the agreed price was twenty-three cents per gallon, f. o. b. Marcus Hook, Pa. The vendee was a dealer in the city of Norfolk, promptly gave instructions and specifications to ship the oil to that place, and this destination or change of destination was accepted by the vendor, and was never changed. The language of the contract as to the place of delivery is this: "All shipments are to be made to the buyer at Marcus Hook, Pa., and no changes in destination are to be made except with the consent of the seller." The collateral facts show that Marcus Hook was not the destination of the oil. Under this contract, as shown by the evidence, it was the point of origin, or place at which it was to be delivered to the carrier by the vendor for transportation to the vendee, and under his instructions given pursuant to the contract, its destination, or place of delivery, was Norfolk. There is no evidence as to the market value of this or any other brand of oil at Marcus Hook, and the testimony was directed to proving such value at Norfolk.

The vendor claims that the court erred in declining to instruct the jury that the plaintiff had proved no recoverable damage occasioned by reason of the defendant's failure to make shipment, and that they must find for the defendant as to that part of the plaintiff's claim. The court took a different view, and instructed the jury thus:

"The court instructs the jury that the measure of

damages for failure to deliver merchandise is the difference between the contract price and the selling price at the time and place of delivery; and if the jury shall find for the plaintiff they shall assess his damages at the difference between the contract price of twenty-three cents per gallon, plus the freight, and the price at which they believe from the evidence the oil which was not delivered would have been sold at Norfolk, at the time it should have been delivered under the contract of January 16, 1920."

It is earnestly contended for the vendor that this instruction is erroneous, because the place of delivery under the contract was Marcus Hook, and that as there was no evidence of the market value at Marcus Hook, therefore there could be no recovery in this case.

While the argument is plausible, and the instruction should doubtless have been differently phrased, there can be no doubt, under the evidence in the case, that it fairly presents the true issue to the jury. The vendor clearly understood that this oil was to be consigned to the vendee at Norfolk, to be marketed there, and the evidence is that at the very time the contract was entered into—"right at the minute," as the vendee testified—the direction was given to the vendor to ship it immediately to his (vendee's) warehouse at Norfolk. Courts should not stick in the bark. The small quantity of oil which was actually delivered under this contract was taken directly from the warehouse of the vendor at Norfolk and delivered to the vendee, Burruss, at Norfolk. As has been said, the vendee's place of business was at Norfolk, and his office address at Norfolk is set forth in the contract. We think the court committed no substantial error against the vendor by treating Norfolk as the place which was understood by both parties to be the place of delivery or destination to

which the oil was to be shipped by the vendor, to be there sold by the vendee to his customers.

[7, 8] It is insisted that the court should not have instructed the jury that in case they found for the plaintiff they should assess his damages at "the difference between the contract price of twenty-three cents per gallon, plus the freight, and the price at which they believe from the evidence the oil which was not delivered could have been sold at Norfolk, at the time it should have been delivered under the contract of January 16, 1920." They contend that instead of using the price at which the oil could have been sold at Norfolk in the instruction, the term "market price" should have been used. But what is market price if not the price at which willing sellers are ready to take, and willing buyers are ready to give? This instruction is quite similar to one which was approved by this court in *Richmond Leather Mfg. Co.* v. *Fawcett*, 130 Va. 484, 107 S. E. 800, in which Boston was the specified place of delivery for goods shipped from Richmond, and the jury were told that the measure of damages was the difference between the defendant's price to the plaintiff and the price at which the goods could have been sold on the Boston market, if delivered in due course.

The evidence clearly shows the market price of the oil in Norfolk during the period here involved. If the vendor had delivered it, the vendee's profits would have been large. The vendor preferred itself to take these profits, for it was competing with the vendee and other dealers in oil in that very market. While doubtless greater care should have been used in drawing this instruction, there is no substantial error in it, and under the facts here shown, it gave the jury the correct rule for measuring the damages here so clearly shown.

The defendant relies upon other clauses of the con-

tract which read, "Terms one per cent—ten days; thirty days net cash from date of invoice," and that, "The financial responsibility of the buyer must at all times be satisfactory to seller or shipments may be suspended." On this point the court gave the jury these two instructions:

"The court instructs the jury if they believe from the evidence the plaintiff's financial responsibility was unsatisfactory to the defendant it had a right, under the terms of the contract, to suspend shipments for that reason, and if they believe *from the evidence* that shipments were suspended *in good faith* for that reason, they must find for the defendant, as to the plaintiff's claim for damages alleged to have been occasioned by reason of the defendant's refusal to make shipment.

"The court instructs the jury if they believe from the evidence that the plaintiff failed to pay for shipments made under the contract in accordance with the terms of said contract, the defendant had a right to refuse to make shipments, and if they believe *from the evidence* that it did so for that reason, they must find for the defendant as to the plaintiff's claim for damages alleged to have been occasioned by reason of the defendant's refusal to make shipments.

The words *italicised* in these two instructions "in good faith" and "from the evidence" were the only changes made by the court in the instructions as originally offered.

It may be that for a true understanding of this controversy it is necessary to make a full recital of all of the evidence, but we think this is not sufficiently important thus to prolong this opinion. Taking the evidence for the vendee, which, when the collateral facts are considered, the jury were fully justified in crediting, notwithstanding the conflicting evidence offered by the vendor,

it sufficiently appears that the vendor, from the beginning of this contract, persistently violated it. Not a single shipment of oil was made from Marcus Hook to the vendee at Norfolk. Upon his insistent demands, he received small quantities of oil from the agents of his vendor directly from its warehouse in Norfolk. He wrote repeated letters demanding the performance of the contract. He testified that he made several trips to Philadelphia to the office of the vendor company, and received repeated assurances that the oil would be promptly shipped to him at Norfolk, and that these promises were persistently and consistently broken. He testifies that he never received any explanation of this persistent refusal to perform the contract, and there are letters in the record confirming his testimony that the vendor never questioned his financial responsibility as justification for its dereliction until the trial of this case.

This defense is based upon the testimony of the witnesses for the vendor, which the jury discredited. This testimony is to the effect that in personal interviews with the vendee, he was told that the reason the oil was not shipped was because he had not paid for some oil which had been already shipped to and received by him. That there was a controversy over these former shipments is shown, but the vendee testifies and shows by bills which are filed in the record that he had good reasons for refusing to pay them, because upon their face they show that the vendor had failed to give him proper credits, and habitually rendered bills for such oil so previously delivered at prices greatly in excess of the price fixed by the contract. After this claim had been put in the hands of Norfolk attorneys for collection, the vendee made a direct remittance to the vendor of the amount which he admitted to be due, though the ven-

dor in this proceeding still claims a small balance thereon, which the jury apparently disallowed.

There seems to have been some confusion in the councils of the vendor, for the credit manager testified that the sales department was after him to make prompt shipments, which he refused to do. Some of its agents repeatedly promised to ship the oil, while the credit manager prevented such shipments. There was no change in the financial responsibility of the vendee after the sale was made; it is sufficiently shown here, and according to his testimony, this question was never raised until after this action was commenced.

[9] Under these circumstances, the court was amply justified in instructing the jury that the vendor could not escape responsibility for its breach of this contract unless it had acted in good faith. This view is supported by *Carpenter* v. *Va.-Car. Chem. Co.,* 98 Va. 177, 35 S. E. 358.

[10] The case is typical. Many like it reach the courts after violent fluctuations in the commodity markets. It is not creditable to human nature that so frequently when prices advance sharply, it is the vendors who make excuses for failure to deliver the goods sold, while when there is a serious recession in prices it is the vendees who seek to avoid their obligations. The legal rule and business morality accord. They alike commend him who, after swearing to his own hurt, changes not; and courts should be astute to maintain the sanctity of such contracts—not acute to support excuses which are not reasons for avoiding them.

We do not think it necessary to pursue the subject further. Some of the issues of fact may be fairly disputable, but they were properly submitted to the jury, and their verdict in favor of the vendee determined them.

*Affirmed.*